SRM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

**Vitalijus Polikarpovas,**
Petitioner
-vs-
**Bruno Stolic,**
Respondent(s)

CV-06-1623-PHX-SRB (JI)

**REPORT & RECOMMENDATION
On Petition for Writ of Habeas Corpus
Pursuant to 28 U.S.C. § 2241**

## I. MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Central Arizona Detention Center at Florence, Arizona, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on June 27, 2006 (#1).  On August 1, 2006 Respondent filed his Answer (#17).   Petitioner filed a Reply on October 10, 2006 (#29).

The Petitioner's Petition is now ripe for consideration.  Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

### A. FACTUAL BACKGROUND

This habeas petition arises out of a certificate of extraditability issued by Magistrate Judge David K.  Duncan in District of Arizona case number 05-6204MJ-DKD (hereinafter "Extradition"), certifying that Petitioner was properly subject to extradition to Lithuania to face charges of burglary. In issuing that order, Judge Duncan restated the allegations against Petitioner:

1

2

3

4

5

6

7
        The Arrest Warrant (denominated as "Enclosure No 5" attached to Government's Exhibit 1) alleges that Vitalijus Polikarpovas violated Paragraph 2 of Article 271 of the Criminal Code of the Republic of Lithuania in that "on 18 July 1999, at about 4.00 p.m. and at about 5.00 p.m., by breaking into non-residential premises – the window workshop of UAB 'Runika', which was being equipped, located at Savitiškio str. 10 b, Panev.žys, he secretly stole the property belonging to the company 'Runika' – 10 sacks of the cement 'Vilmesta' and a welding apparatus totally estimated LTL 920." Based upon the accompanying investigative report which includes interviews with witnesses and the Defendant, Vitalijus Polikarpovas, it is more particularly alleged that Vitalijus Polikarpovas made arrangements to sell bags of cement to two individuals.

8

9

10
        He then in the company of another individual traveled by taxi twice to Runika, opened a gate to a workshop, escorted the taxi into the workshop and loaded bags of cement and the welding apparatus into the taxi. On one of the trips into the workshop Respondent was approached by a worker who inquired about the removal of the cement. The Respondent answered that the cement belonged to him. Runika later reported the cement and welding apparatus as stolen.

11
(Extradition #16, Order 5/22/6 at 5-6.)

12

13
An investigation ensued, and is summarized in the documents submitted with the application for extradition, which included:

14

15

16

17

18

19

20
    (1)    **Anilionis - The Concerned Employee** - An interview of Virgis Anilionis, who said that on July 18, 1999, his brother Jurijus Anilionis called him on his mobile phone to tell him that some men were taking goods away from UAB "Runika" by taxi. Anilionis called Brazdžionis, the head of the Runika workshop, and told him about the men removing the goods. Brazdžionis told him no one had permission to remove any goods. Anilionis reported the matter to the police. (*Id.* at 21-22.)

21

22

23

24

25

26

27
    (2)    **Janulis - Another Employee** - An interview of Vaidas Janulis who reported that on July 18, 1999, he was called by Virgis Anilionis who informed him that cement and a welder had been stolen from UAB "Runika." When Janulis arrived at Runika, he found out from Anilionis that the police had found the goods and the men who stole them. Later, Janulis learned from police that one of the men was Vitalijus Polikarpovas, a man who had come to Runika several weeks prior, but he did not work at Runika.

28

1      (3)    **Rudys - The Identifier of the Stolen Goods** - An interview of Valdas Rudys,

2            who was called by Virgis Anilionis and told about the theft from UAB "Runika".

3            Rudys went to the police, who took him to the house in Jotvingių Street, and

4            explained that the residents had purchased cement and a welder stolen from

5            Runika.  Rudys saw the cement and welder, and identified them as Runika

6            property. Rudys was told by police that the property had been stolen by Vitalijus

7            Polikarpovas, who Rudys had seen several times at Runika.   (*Id.* at 24.)

8      (4)    **Alekna - The Investigating Officer** - Statements by Aidas Alekna, a Panevéžys

9            police officer, who took a complaint from V. Rudys who reported the theft,

10           described the use of the taxi, and implicated Vitalijus Polikarpovas, a former

11           employee of UAB Runika.  Officer Alekna located the taxi and its driver, who

12           described the homes where the stolen goods were taken, and the pub where he

13           had picked up the passengers who got them.  Officer Alekna then  went to the

14           homes, on Jotvingių street, and interviewed Povlias Klezys and Regina Vizoriene

15           who said they had purchased the goods from Vitalijus Polikarpovas and Vytautas

16           Janušonis.  The goods were recovered from Klezys and Vizoriene.   Officer

17           Alekna then went to the pub described by the taxi driver, and found Polikarpovas

18           and Janušonis. (Extradition #1, Complaint, Exhibit 2, Enclosure 4, at "20.")[1]

19      (5)    **Klezys - The Primary Purchaser** - An interview of Povilas Klezys who

20           reported that a few days before the theft he met a friend, Vytautas Janušonis at

21           a pub.  Janušonis introduced him to man he called Vitalijus Polikarpovas.

22           Polikarpovas offered to sell Klezys some leftover cement.  Klezys agreed to

23           buy four bags.  They also discussed the potential that Klezys' neighbor, Regina

24           Vizoriene might want to purchase some as well.   On July 18, 1999, Janušonis

25

26        [1]  The numbering of the pages of the summary of the criminal case are irregular, and are therefore reproduced

27    verbatim herein.  The originals of the Exhibits to the Complaint (Extradition #1) were introduced at the extradition hearing as Exhibits 1 and 2, but were apparently forwarded to the State Department with the extradition certification. (Extradition #18, Letter to State Dept.)   Exhibit 3 introduced at the extradition hearing is undefined, and apparently not part of the

28    Court's record. (*See* Extradition #17, R.T. 1/10/6 at 14-15.)

and Polikarpovas came to say the cement would be delivered soon. Klezys went to Vizoriene and found she was interested in six bags of cement. Later that day, Janušonis and Polikarpovas delivered by taxi six bags of cement to Vizoriene and four bags to Klezys. Klezys, seeing the welder, inquired about it and purchased it as well. Klezys paid Polikarpovas for the cement and the welder. (*Id.* at "30-30ᵃ".)

(6)   **Vizorienè - The Secondary Purchaser** - An interview of Regina Vizorienè who arranged to purchase some cement through her neighbor Povlias Klezys, and stated it was delivered by Vytautas Janušonis and a man who introduced himself as Vitalijus Polikarpovas, who she paid for the cement. She also saw Janušonis and Polikarpovas delivering a welding apparatus to Klezys. (*Id.* at "2-47.")

(7)   **Janušonis - The Unwitting Accomplice** - An interview of Vytautas Janušonis, who stated that while at a beer pub he met a man named Vitalijus Polikarpovas, who lived in Kaunas City. On July 17, 1999, he was at the pub with Polikarpovas and Povilas Klezys, when Polikarpovas offered to sell Klezys some cement. Polikarpovas claimed that he worked at UAB "Runika," knew the owner, and kept 10 bags of cement there, but the owner had told him to take them away. On July 18, Janušonis confirmed how much cement Klezys and his neighbor Regina Vizorienè wanted. He then went with Polikarpovas by taxi, to UAB "Runika" and got six bags of cement and delivered them to Klezys. They returned again to UAB "Runika" by taxi, got four more bags and a welder, which were delivered to Klezys. Polikarpovas also sold the welder to Klezys. Janušonis and Polikarpovas then went back to the pub. (*Id.* at "31-32.")

(8)   **Blauzdys - The Taxi Driver** - An interview of Aidas Blauzdys, the taxi driver who picked up two unknown, intoxicated men at the beer pub on Vilniaus Street, took them to a storehouse on Savitiškio Street where they loaded his trunk with six bags of cement, and them he took them to a house on Jotvingių Street. After they unloaded the cement, he drove them back to the storehouse, where they

1    loaded his car with another four bags of cement and a welder.  One of the

2    passengers was asked by workers at the storehouse about the cement, but the

3    passenger told them that it belonged to him.  Blauzdys then drove them back to

4    the house where they unloaded the stuff, and paid Blauzdys.  (*Id.* at "25-25.")

5    During an "identity parade," Blauzdys identified the suspect, Vitalijus

6    Polikarpovas, as one of the men he had driven from Savitiškio Street to Jotvingių

7    Street.  (*Id.* at 41.)

8    (9)    **Brazdžionis - The Owner Who Gave a Ride** - An interview of Audrius

9    Brazdžionis, who reported that at the end of June, 1999, had given a ride to a

10   hitchhiker traveling from Kaunas City, who introduced himself as Vitalijus

11   Polikarpovas from Kaunas City.  Brazdžionis left Polikarpovas in Cikiškés, but

12   gave him his phone number.  Two weeks later Polikarpovas called him and said

13   that he wanted to come to Panevèžys.  Polikarpovas later showed up and asked

14   Brazdžionis for a job at UAB "Runika."  Polikarpovas came again the next day,

15   and Brazdžionis showed him where he would work and what he would do.

16   Polikarpovas left for a week, and then showed up again on July 15-16, 1999,

17   again asking for work.  Brazdžionis then left for Germany and heard nothing

18   more until being told that Polikarpovas had been caught stealing from Runika.

19   (*Id.* at "27-28.")

20   (10)    **Polikarpovas - The Suspect** - An interrogation of Vitalijus Polikarpovas, who

21   claimed that on July 10, 1999 he had come to Panevèžys from Kaunas City to

22   see Audrius Brazdžionis, the owner of UAB "Runika."  Polikarpovas was

23   working at Runika, and sleeping there. He met Vytautas Janušonis at a beer pub,

24   and began meeting him there every day. On July 17, 1999, Janušonis introduced

25   his friend Povilas Klezys, and they discussed Klezys' need for cement and

26   Polikarpovas' ability to get cement.  They also discussed Klezys' neighbor's

27   need for cement. On July 18, 1999, after finding out how much cement Klezys

28   needed, Polikarpovas and Janušonis took a taxi to Runika.  They got six bags of

1 cement into the taxi and delivered them to a house on Jotvingių Street.  Being

2 drunk, he didn't know which house.  They then returned to Runika and got four

3 more bags of cement and a welder.  They took those to Jotvingių Street and sold

4 them as well.  Polikarpovas and Janušonis then returned to the pub.  The next

5 thing he remembers is waking up at the sobering-up station.  (*Id.* at 23.)

6 Polikarpovas confirmed his statements during an inspection of the scene of the

7 crime.  (*Id.* at 38-39.)

8 The suspect was charged with the theft, and summary proceedings determined that a trial

9 should be held.  The suspect executed a "written pledge of not leaving" wherein he identified

10 himself as Vitalijus Polikarpovas, and provided an address of Taikos Avenue 82-57, Kaunas.

11 The criminal court's documents identified his date of birth as March 23, 1972.  The suspect

12 absconded, and on August 31, 1999 a warrant for his arrest was issued. (Extradition #1,

13 Complaint, Exhibit 2, Enclosure 5.)  On September 8, 1999, the criminal case was suspended.

14 (*Id.* at Enclosure 6.)

15 Also produced by the Government is a Lithuanian passport application made by Vitalijus

16 Polikarpovas, born March 23, 1972, residing at Taikos Avenue 82-57, Kaunas. (*Id.* at

17 Enclosure 1.)  Also provided were photographs, that the Government identified without

18 objection by Petitioner as passport photos.  (*Id.* at Enclosure 2; Extradition #17, R.T. 1/10/06

19 at 16-17.)[2]

20

21 **B. PROCEEDINGS ON EXTRADITION**

22 The extradition proceeding  was commenced on August 19, 2005, when the United

23 States, acting on behalf of the Government of the Republic of Lithuania, executed a Complaint

24 (Extradition, #1) for extradition of Petitioner to Lithuania pursuant to 18 U.S.C. § 3184.  An

25 arrest warrant was issued (Extradition, #3), and Petitioner was arrested on November 28, 2005

26

27 [2] The basis for identifying the photos as passport photos is unclear.  The space on the passport application
28 itself (Extradition #1, Complaint, Exhibit 2 at Enclosure 1) is blank.  Enclosure 2 does not contain anything identifying it with a passport, but instead bears repeated stamps of the "Chief Police Commissariat, Panevėžys City."

- 6 -

1    (Extradition, #20, Arrest Warrant Returned Executed).   Counsel Tom Crow was appointed to

2    represent Petitioner, who was ordered detained  (Extradition #5, M.E. 11/29/5).

3             On January 10, 2006, Judge Duncan conducted an extradition hearing, where Petitioner

4    was present with counsel.  (Extradition #17, R.T. 1/10/06; Extradition #11, M.E. 1/10/06.)

5    At the conclusion of the hearing, counsel were directed to file supplemental briefs.

6    (Extradition #11, M.E. 1/10/06.)  Counsel did so, and on May 22, 2006, Judge Duncan issued

7    his Findings of Fact and Conclusions of Law and Certification of Extraditability  (Extradition

8    #16).   The Certificate was ordered to be submitted to the U.S. Department of State for a

9    determination of whether Petitioner should be surrendered to Lithuania.   (Extradition #16,

10   Certificate.)

11            In issuing his certificate, Judge Duncan reached the following conclusions, *inter alia*:

12        1.      the court had proper jurisdiction;

13        2.      an extradition treaty was in effect;

14        3.      the alleged crime was covered by the treaty, and charges for the crime remained

15                pending;

16        4.      there was "competent legal evidence which supports the issuance of an arrest

17                warrant for Vitalijus Polikarpovas for the crime alleged in the Complaint"; and

18        5.      "[t]he evidence is sufficient to establish probable cause to believe that the crime

19                was committed and that the person before the court, Vitalijus Polikarpovas,

20                committed it".

21   (Extradition #16, Certification  at 8-9.)

22

23   **C.  PRESENT HABEAS PROCEEDINGS**

24            On June 27, 2006, Petitioner filed the instant Petition for Writ of Habeas Corpus

25   pursuant to 28 U.S.C. § 2241, asserting that there was no probable cause to conclude that

26   Petitioner was the person who committed the alleged offense in Lithuania.  Specifically,

27   Petitioner alleges that "[t]here was no evidence in the record which connected the passport

28   photo contained in the extradition documents to the person identified by the witnesses in the

1  remainder of the extradition documents." (#1 at 5.)

2  　　　The extradition of Petitioner was stayed, and service and an answer was ordered (#7).

3  On August 1, 2006 Respondent filed his Answer (#17).   Respondent concedes the propriety

4  of habeas review of the Petitioner's ground for relief,[3] but asserts there was sufficient

5  evidence to support Judge Duncan's order.

6  　　　Following delays resulting from Petitioner's transport to Chicago for extradition, and

7  ultimate return to Arizona (*see* Notice re Petitioner's Custody Status, #27), Petitioner filed

8  a Reply on October 10, 2006 (#29).  Petitioner argues in his Reply that the evidence may show

9  that Petitioner is the person charged with the crime (as established by the listing of his name

10  and address in the charges), but there was not sufficient evidence to show that Petitioner

11  committed the crime.

12

13  　　　　　　　　　　　**III. APPLICATION OF LAW TO FACTS**

14  　　　The sole issue in this habeas proceeding is whether there was sufficient evidence

15  presented in the extradition proceeding for Judge Duncan to conclude that there was "probable

16  cause to believe that the crime was committed and that the person before the court, Vitalijus

17  Polikarpovas, committed it".  (Extradition #16 at 8-9.)

18  　　　**Extent of Habeas Review** -  "The scope of the district court's review of a magistrate's

19  extradition order on a petition for writ of habeas corpus is limited to '. . . whether there was

20  any evidence warranting the finding that there was reasonable ground to believe the accused

21  guilty.' " *Quinn v. Robinson,* 783 F.2d 776, 790 (9th Cir. 1986) (quoting *Fernandez v.*

22  *Phillips*, 268 U.S. 311, 312 (1925).

23  　　　　　The magistrate's probable cause determination "serve[s] only the narrow
function of indicating those items of submitted evidence on which the

24  　　　　　decision to certify extradition is based." Because the magistrate's
probable cause finding is thus not a finding of fact "in the sense that the

25  　　　　　court has weighed the evidence and resolved disputed factual issues," it
must be upheld if there is any competent evidence in the record to

26  　　　　　support it.

27

28  　　　[3] *See Vo v. Benov,* 447 F.3d 1235, 1240 (9th Cir. 2006) (" a habeas petition is the only available avenue to
challenge an extradition order").

1   *Quinn*, 783 F.3d at 790 (citations omitted).  The question is one of sufficiency to find

2   probable cause of guilt, not sufficiency to find guilt.  *Id.*  "But the country seeking extradition

3   is not required to produce all its evidence at an extradition hearing and it is not our role to

4   determine whether there is sufficient evidence to convict the accused. The magistrate does not

5   weigh conflicting evidence and make factual determinations but, rather, determines only

6   whether there is competent evidence to support the belief that the accused has committed the

7   charged offense."  *Id.*

8        Thus, this habeas court's scope of review is limited to determining "whether, because

9   of an absence of competent evidence, the magistrate's determination is wrong as a matter of

10  law."  *Id.* at 815.  In conducting such review, the "credibility of witnesses and the weight to be

11  accorded their testimony is solely within the province of the extradition magistrate."  *Id.*

12       **Nature of Evidence Presented** - In this proceeding, the Government introduced

13  evidence that could be categorized as two different stages in the process: the evidence of the

14  crime to support the prosecution (crime evidence), and the evidence connecting Petitioner to

15  the prosecution (identity evidence).  Both must be established to provide the necessary

16  connection between Petitioner and the crime.  Petitioner alleges that only the latter ("identity

17  evidence") was established in this extradition proceeding, and that the Government failed to

18  connect Petitioner, through the prosecution, to the commission of the crime.

19       **The Nature of  Judge Duncan's Probable Cause Determination** - In making his

20  findings of fact and conclusions of law, Judge Duncan noted that Petitioner argued *inter alia*

21  that "there is not sufficient evidence in the record to establish probable cause that he is the

22  individual who committed the charged offense."  (Extradition #16, Order at 6.)  And indeed,

23  Judge Duncan had properly noted his duty to find probable cause that "a crime was committed

24  and that the person before the court committed it."  (*Id.* at 5.)

25        In resolving Petitioner's issue, however, Judge Duncan stated his conclusion as a

26  finding that "sufficient evidence exists to establish probable cause that the Respondent *is the*

27  *individual sought pursuant to the warrant of arrest*."  (Extradition #16, Order at 6 (emphasis

28  added).) Thus, Judge Duncan's discussion focused not on evidence of Petitioner's commission

1    of the crime, but on evidence of Petitioner's having been charged with a crime.   In doing so,

2    Judge Duncan focused on the "identity evidence" to the exclusion of the "crime evidence."

3         This shift in focus is shown by the evidence on which Judge Duncan relied to justify his

4    conclusion:

5              The Court finds that sufficient evidence exists to establish
       probable cause that the Respondent is the individual sought pursuant to
6      the warrant of arrest. The August 31, 1999 Order issuing the arrest
       warrant for Vitalijus Polikarpovas (Enclosure No 5 attached to
7      Government's Exhibit 1) sets forth a birth date of March 23 1972, and a
       residential address of Taikos Avenue 82-57, Kaunas City. Both sets of
8      particulars match the information contained in the passport application
       submitted for this Court's consideration. The passport photo submitted
9      to this Court as part of this passport application matches the visage of the
       Respondent such that, taking these facts together, there is probable cause
10     to believe that the person named in the extradition request is the
       individual sought pursuant to the warrant of arrest and is the same
11     individual presently in the custody of this Court and identified as
       Vitalijus Polikarpovas.   The Court Order issuing the arrest warrant
12     further indicates that Vitalijus Polikarpovas pledged not to leave his
       residence address for a period of a year and a half but that he had not
13     done so because "to the knowledge of the court, the accused Vitalijus
       Polikarpovas has not been living at the address: Taikos Avenue 82-57,
14     Kaunas." A subsequent court order issued upon defendant's failure to
       appear on September 8, 1999, notes that "Vitalijus Polikarpovas does not
15     live at the address indicated in the written pledge of not leaving: Taikos
       Avenue 82-57, Kaunas city". There is probable cause to believe that
16     Respondent provided this address to the authorities in the charging
       jurisdiction – an address which matches the passport application
17     associated with the photograph which matches the Respondent in this
       Court's custody. The Court admits there is the possibility that the
18     individual who appeared before the district court of Panev.žys City
       falsely provided the name and address of a person from Kaunas City and
19     that the Court now has before it the person whose identity was falsely
       assumed. The Court believes this possibility is remote and far less than
20     the fair probability that the individual sought pursuant to the arrest
       warrant is the person presently in the custody of the United States
21     District Court for the District of Arizona.

22   (Extradition #16, Order at 6-7.) Thus, it is apparent that in at least this part of his Order, Judge

23   Duncan was not responding to Petitioner's challenge to evidence of his commission of the

24   crime, but was instead addressing only the "identity evidence", *i.e.* whether it was Petitioner

25   who had been prosecuted in Lithuania.  The evidence discussed by Judge Duncan does not

26   include the "crime evidence."  It does not extend back to the commission of the crime, nor

27   even its investigation.  Rather, it begins with the August 31, 1999 arrest warrant, moves to the

28   pledge not to leave, and ends with the order on failure to appear before the Lithuanian court.

1   And Judge Duncan properly connects these to Petitioner through his passport application and

2   his visage.  However, none of this does anything to establish that Petitioner committed the

3   crime, but merely that he was prosecuted for its commission.[4]

4          Judge Duncan did ultimately address the commission of the crime issue when he

5   concluded, without explanation, that "[t]he evidence is sufficient to establish probable cause

6   to believe that the crime was committed and that the person before the court, Vitalijus

7   Polikarpovas, committed it." (Extradition #16, order at 9.)  The question thus remains for this

8   habeas court to answer: was there competent evidence to support a probable cause finding that

9   Petitioner committed the crime?

10          **Evidence of Commission of Crime** - Petitioner does not, in this proceeding,

11   challenge whether an extraditable crime occurred.  His sole argument is that there was

12   insufficient evidence before Judge Duncan that Petitioner committed the crime.

13          Respondent argues that there was competent evidence that Petitioner committed the

14   crime.  However, much of the evidence to which Respondent points is the same evidence relied

15   upon by Judge Duncan to connect Petitioner with the prosecution (and not the crime),

16   including the August 31, 1999 arrest warrant and order and the "written pledge of not leaving."

17   (#17 at 3-4.)   The only evidence pointed to by Respondents that does serve to connect

18   Petitioner to the crime, as opposed to the prosecution, is limited to two items: (1) a

19   confession; and (2) an "identity parade."

20          The Confession - Respondents argue that the person who appeared before authorities

21   in 1999 ("the accused") had confessed to police "that he had come from Kaunas prior to

22   stealing cement and welding equipment."   (Response, #17 at 4 (citing Enclosure No.  4 to

23   Government's Exhibit 2.)  Respondents argue that the person providing this confession had

24   been described by witnesses Vytautas Janusonis, Vaidas Janulis and Audrius Brazdzionis as

25

26          [4] The transcript of the extradition hearing suggests that Judge Duncan was not ignoring the need for the "crime
27   evidence," but had   already implicitly determined that the confession and "identity parade" discussed hereinafter
    adequately connected the person arrested in the Lithuanian prosecution with the commision of the crime. (R.T. 1/10/06,
    #17 at 33-34.)  In that event, the only thing that would remain would be to in turn establish that Petitioner was the person
28   arrested (the "identity evidence").

1    "Vitilijus Polikarpovas from 'Kaunas City.' " (*Id.* (citing Enclosure No. 4 to Government's

2    Exhibit 2).)  And, Respondents note, Petitioner lists Kaunas City as his permanent address in

3    his passport application.  (*Id.*)

4         And indeed, a review of the July 30, 1999 "Notice to the Court" shows that during an

5    interview of the suspect, the suspect related that he had traveled from Kaunas to Panevéžys

6    (where the crime occurred), that he met Vytautas Janusonis at a beer pub, and with Janusonis

7    took a taxi to UAB "Runika" and took cement and a welder and sold it to various persons.

8    (Complaint, #1 at Exhibit 2, Enclosure 4 at "23".)  The Notice does not, however, reflect how

9    the suspect being interviewed was identified as "Vitalijus Polikarpovas." That information was

10   supplied, however, by the testimony of the taxi driver, and others, as discussed hereinafter.

11        The Identity Parade - Respondent argues that "the July 30, 1999 Notice to the Court

12   indicates that a witness identified the suspect through an 'identity parade' as Vitalijus

13   Polikarpovas."   (Answer, #17 at 4 (citing Enclosure No.  4 to Government's Exhibit 2).)

14        The documents submitted in support of the extradition application reflect that Aidas

15   Blauzdys stated that he had driven the taxi used to pickup the cement and welder and deliver it

16   to the buyers.  The record then states that "[d]uring the identity parade, witness Aidas Blauzys

17   [sic] identified the accused Vitalijus Polikarpovas as the person, whom he took by taxi from

18   Savitiškio str.  10$^b$ to Jotvingių str."  (Extradition #1, Complaint at Exhibit 2, Enclosure 4 at

19   "41".)[5] Petitioner concedes that the taxi driver made an identification, but protests in his Reply

20   that the "identity parade" is not defined and is not itself part of the record.  (Reply, #29 at 2-3.)

21        If this matter were being tried, the nature of the "identity parade" would be of the utmost

22   interest, raising questions of its fairness and reliability.  However, for purposes of extradition,

23   the processes of garnering evidence are not so relevant.  "[A]lthough the magistrate may take

24   the circumstances of an identification into account in assessing its reliability, there is no per

25

26         [5] There was ample evidence corroborating the story of the taxi driver, including statements of the accomplice,
     Vytautas Janŭsonis (Extradition #1, Complaint at Exhibit 2, Enclosure 4 at "31-32"), the buyers, Povilas Klezys (*id.* at "30-
27   30ᵃ"") and Regina Vizoriené (*id.*  at "2-47"), another taxi driver, Audrius Brazdzionis, who claimed to have picked up
     Vitalijus Polikarpovas on the road from Kaunas (*id.*  at 27-28), and an eyewitness to the theft, Virgis Anilionis, who
28   related the use of a taxi (*id.* at 21-22).

1  se rule that specifies which identification procedures are 'competent' for probable cause

2  purposes. An identification does not fail to constitute competent evidence merely because the

3  required United States procedures for admissibility of the identification at trial were not

4  followed." *Quinn,* 783 F.2d at 815.

5         Moreover, it is of no moment that there is no direct evidence from the various

6  witnesses, e.g. depositions, affidavits, etc.  As in a probable cause determination in the United

7  States for the issuance of a Complaint and warrant, the use of hearsay evidence is permitted.

8  "With regard to the admissibility of evidence, the general United States extradition law

9  requires only that the evidence submitted be properly authenticated." *Emami v. United States*

10  *Dist. Court*, 834 F.2d 1444, 1451 (9th Cir.1987) (upholding the use of unsigned translations

11  of witness statements).  *See* 18 U.S.C. § 3190 ("Depositions, warrants, or other papers or

12  copies thereof offered in evidence upon the hearing of any extradition case shall be received

13  and admitted as evidence on such hearing for all the purposes of such hearing if they shall be

14  properly and legally authenticated...").  *See also Quinn*, 783 F.2d at 815 (rejecting claim of

15  "double-hearsay").

16         **The Connection to Petitioner** -   Based on the foregoing, there is ample evidence to

17  find probable cause to believe that the suspect in the Lithuanian prosecution did indeed commit

18  the crime of stealing the cement and the welder.  Thus, there was competent evidence for a

19  probable cause determination on the "crime evidence"

20         However, that does not necessarily implicate Petitioner.  The identification of the

21  Lithuanian suspect as one "Vitalijus Polikarpovas" may not of itself be sufficient.  However,

22  if the evidence not only provided probable cause that X committed the crime and was arrested

23  for it (the "crime evidence"), but also probable cause to believe that Y is the same person who

24  was arrested (the "identity evidence"), then X and Y are the same, and therefore it can be said

25  there is probable cause to believe that Y committed the crime.  That logic provides a basis for

26  extrapolating probable cause from the evidence showing that Petitioner is the same person as

27  that who was being prosecuted in Lithuania under the name "Vitalijus Polikarpovas."

28         The evidence connecting Petitioner to the Lithuanian suspect was amply identified by

1   Judge Duncan, and included the identity of names,  addresses and birthdays between the

2   information provided by the Lithuanian suspect in the course of the prosecution, and that

3   provided by Petitioner on his passport. Judge Duncan found that the "passport photo submitted

4   to this Court as part of this passport application matches the visage of the Respondent."

5   (Extradition #16, Order at 6.) Thus both the "crime evidence" and the "identity evidence" were

6   provided by the Government.  From Petitioner to his passport photo to his passport application

7   to the Lithuanian court documents to the suspect and witnesses in the Lithuanian prosecution,

8   the line of evidence establishes probable cause to believe not only that Petitioner was the one

9   being prosecuted in Lithuania, but also that he was the one who committed the theft of the

10  cement and welder.

11       Thus the evidence before Judge Duncan, in the words of Petitioner, connects "the dots"

12  between Petitioner and the person identified by the Lithuanian witnesses (and the confessing

13  suspect) as having committed the theft.  As such, there was competent evidence to support

14  Judge Duncan's conclusion that there was probable cause to find that Petitioner committed the

15  crime charged.

16

17                          **IV.  RECOMMENDATION**

18       **IT IS THEREFORE RECOMMENDED** that the Petitioner's Petition for Writ of

19  Habeas Corpus, filed June 27, 2006 (#1) be **DENIED**.

20       **IT IS FURTHER RECOMMENDED** that stay of extradition issued July 17, 2006 (#7)

21  be **LIFTED**.

22

23                          **V. EFFECT OF RECOMMENDATION**

24       This recommendation is not an order that is immediately appealable to the Ninth Circuit

25  Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate*

26  *Procedure*, should not be filed until entry of the district court's judgment.

27       However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall

28  have ten (10) days from the date of service of a copy of this recommendation within which to

1  file specific written objections with the Court.  *See also* Rule 8(b), Rules Governing Section

2  2254 Proceedings.   Thereafter, the parties have ten (10) days within which to file a response

3  to the objections.  Failure to timely file objections to any factual or legal determinations of

4  the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of

5  the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*).

6

7  DATED: October 26, 2006                                    _____

8          S:\Drafts\Outlbox\06-1625-1r RR 06 10 20 m HC on Extradition.wpd                     JAY R. IRWIN
                                                                    United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -